TRINA A. HIGGINS, United States Attorney (#7349)
AARON B. CLARK, Assistant United States Attorney (#15404)
Attorneys for the United States of America
111 South Main Street, Ste. 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| UNITED STATES OF AMERICA, | Case No. 2:22CR0002-HCN |
|---|---|
| Plaintiff, | INDICTMENT |
| vs. | Counts 1-5: 18 U.S.C. § 1343 (Wire Fraud) |
| JAMES WOLFGRAMM, aka SEMISI NIU, aka JAMES VAKA NIU, BITEX, LLC, and OHANA CAPITAL FINANCIAL, INC. | Counts 6-7: 18 U.S.C. § 1957 (Money Laundering) |
| Defendants. | |

The Grand Jury Charges:

## BACKGROUND

At all times relevant to this Indictment:

1. Defendant JAMES WOLFGRAMM, also known as (aka) SEMISI NIU, and JAMES VAKA NIU (WOLFGRAMM), is a resident of Spanish Fork, Utah.

2. BITEX, LLC (BITEX) is a Wyoming Corporation with its principal place of business in Orem, Utah. WOLFGRAMM is listed as the owner and registered agent for BITEX. BITEX claimed to be engaged in manufacturing cryptocurrency mining machinery.

3. FiberTek Hosting, LLC (FiberTek) was registered with the Utah Division of Corporations on September 19, 2018. WOLFGRAMM is listed as the president and owner of FiberTek. FiberTek's registration with the Utah Division of Corporations expired on December 23, 2019.

4. OHANA CAPITAL FINANCIAL, INC. (OCF) was registered with the Utah Division of Corporations on October 9, 2019. OCF's filing documents with the Utah Division of Corporations listed OCF to be a business involved in "Management, Scientific, and Technical Consulting Services." WOLFGRAMM and OCF, though, presented OCF to the public as a private financial services company. OCF's registration with the Utah Division of Corporations expired on January 27, 2021.

## SCHEMES AND ARTIFICES TO DEFRAUD

5. Beginning in and around July 2018, within the District of Utah and elsewhere,

**WOLFGRAMM, BITEX, and OCF,**

defendants herein, devised and intended to devise several schemes and artifices to defraud customers and business associates, including B.C., J.C., M.K., V.F.M., and J.O., and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, and omissions of material facts.

6. These schemes, alleged more fully below, included the following:

   a. WOLFGRAMM's and BITEX's solicitation and inducement to receive funds from BITEX customers, including B.C. and J.C., based on false and misleading promises and omissions of material facts;

b. WOLFGRAMM'S and OCF's solicitation and inducement to receive funds from depositors, including M.K. and V.F.M., based on false and misleading promises and omissions of material facts; and

c. WOLFGRAMM's false representations and promises to J.O. to purchase and take possession of the Sports City building and land in Draper, UT, as well as the revenue of the businesses operating thereon.

**MANNER AND MEANS**

7. In execution of these schemes and artifices to defraud, WOLFGRAMM, BITEX, and OCF employed the following manner and means:

8. Since at least 2018, WOLFGRAMM has represented himself on social media and in private communications as a multimillionaire who made his fortune in cryptocurrency. These representations at times included the use of images of cryptocurrency wallets (holding millions of dollars' worth of cryptocurrency) and a suitcase full of cash. WOLFGRAMM also frequently posted to social media photos of expensive sports cars he claimed to own. In reality, WOLFGRAMM did not own some of the vehicles depicted, having copied and sometimes altered the photos from other websites or social media feeds.

9. WOLFGRAMM used this self-created image of a wealthy, successful businessman to gain false trust with victims and lure them to his businesses, including BITEX and OCF. In reality, these businesses, which WOLFGRAMM operated and controlled, amounted to little more than false storefronts: promising products and services to customers that they did not have and could not deliver.

10. WOLFGRAMM also used this false image to fraudulently purchase and take possession of the Sports City building and land in Draper, UT, as well as the revenue of the businesses operating thereon.

A. **BITEX Mining Fraud**

11. At least as far back as summer 2018, WOLFGRAMM purported to sell cryptocurrency mining equipment to customers, promising his machines would deliver sizeable cryptocurrency returns. By fall 2018, WOLFGRAMM had created BITEX and used it to market and sell his supposed machines.

12. WOLFGRAMM and BITEX sales representatives marketed BITEX as a company "in the business of developing and selling equipment used in cryptocurrency mining." WOLFGRAM and BITEX claimed that their mining equipment included proprietary software capable of mining all forms of cryptocurrency. This, WOLFGRAMM and BITEX claimed, enabled the BITEX machines to seamlessly switch mining operations to whichever cryptocurrency was most profitable at any given time.

13. WOLFGRAMM and BITEX further represented to potential customers that BITEX sold at least four different types of proprietary mining machines. These purported machines varied in price and speed/computing power. WOLFGRAMM and BITEX represented the speeds of BITEX's purported mining machines by the number of solutions each machine's "processing cards" were capable of solving per second (SOL/s). For example, for BITEX's highest priced machines – the "Bitex Block Buster" – WOLFGRAMM and BITEX guaranteed for one customer that this supposed machine would perform at speeds of 750k SOL/s per card. The higher the SOL/s for each processing

card, the more cryptocurrency each card/machine would supposedly mine per month (as compared to other cards/machines with lower SOL/s rates).

14. WOLFGRAMM and BITEX displayed one of the purported "Bitex Block Buster" machines in BITEX's office space, connected to a monitor that appeared to display the machine's real-time mining operations. In reality, the machine was a fake, and the monitor displayed a pre-recorded loop that simply gave the appearance of mining activity.

15. Meanwhile, the sales contracts for BITEX machines typically required BITEX customers to enter into separate "hosting" agreements with FiberTek, which WOLFGRAMM also owned. Under these hosting agreements, FiberTek would house and run the BITEX customers' machines, for a monthly fee, while promising to pay out to BITEX customers the profits from their machines' mining operations. This arrangement enabled WOLFGRAMM to maintain possession and control over BITEX customers' purported machines, often without the customer ever seeing or inspecting the equipment purchased.

16. In and around November and December 2018, WOLFGRAMM and BITEX fraudulently induced B.C. and J.C., through various misrepresentations, to purchase "Bitex Block Buster" machines and have these machines hosted by FiberTek.

**B.C.**

17. On or about December 2018, B.C. paid WOLFGRAMM and BITEX $1,044,000 (including a wire for $543,973 on or about December 24, 2018) for six "Bitex Block Buster" machines and agreed to have FiberTek host and run the purported machines.

18. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and BITEX made the following false and fraudulent statements of material fact to B.C.:

   a. That each of the 180 processing cards for B.C.'s six "Bitex Block Buster" machines (30 cards per machine) would run at 750k SOL/s; when in fact, BITEX had no working proprietary "Bitex Block Buster" machines, and no machines with processing cards capable of producing 750k SOL/s; and

   b. That B.C.'s six "Bitex Block Buster" machines had proprietary software that allowed them to seamlessly switch between mining any form of cryptocurrency – whichever was most profitable at the time; when in fact, BITEX mining machines had no working proprietary software that allowed them to seamlessly switch between mining operations for any form of cryptocurrency; and

   c. That B.C. would receive weekly payouts for the machines' mining operations; when in fact, B.C. did not receive the promised payouts.

**J.C.**

19. In November 2018, J.C. contracted with BITEX to purchase three "Bitex Block Buster" machines for a total of approximately $675,000. J.C. further agreed to have FiberTek host the machines.

20. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and BITEX made the following false and fraudulent statements of material fact to J.C.:

   a. That each of the processing cards for J.C.'s three "Bitex Block Buster" machines would run at 100k SOL/s; when in fact, BITEX had no working proprietary "Bitex Block Buster" machines, and no machines with processing cards capable of producing 100k SOL/s; and

   b. That J.C.'s three "Bitex Block Buster" machines had proprietary software that allowed them to seamlessly switch between mining any

form of cryptocurrency – whichever was most profitable at the time; when in fact, BITEX mining machines had no proprietary software that allowed them to seamlessly switch between mining operations for any form of cryptocurrency; and

c. That J.C. would receive monthly payouts for the machines' mining operations; when in fact, J.C. did not receive the promised payouts.

21. In July 2019, after J.C. had not received the promised monthly payouts from supposed mining operations, J.C. requested that WOLFGRAMM provide J.C. the "Bitex Block Buster" machines he had purchased. Ultimately, WOLFGRAMM instead forwarded lower-cost machines to J.C. WOLFGRAMM assured J.C. that these machines, while not the ones J.C. had purchased, would provide similar collective performance as compared to the collective performance of three "Bitex Block Buster" machines. In fact, the machines WOLFGRAMM and BITEX provided to J.C. were inferior to the equipment J.C. purchased and incapable of collectively delivering the processing performance specified in J.C.'s purchase contract with BITEX.

22. In or about August 2019, J.C. and WOLFGRAMM agreed on a new joint crypto-mining venture. J.C. agreed to the venture for purposes of maintaining communication with WOLFGRAMM and to try to mitigate his potential losses. As part of this joint venture, WOLFGRAMM acknowledged, among other things, that the machines provided to J.C. had been inferior to the machines J.C. purchased. WOLFGRAMM also agreed to "credit" J.C. for his losses with BITEX.

23. In an effort to lull J.C. into a false sense of security, WOLFGRAMM signed a "Personal Guarantee" and a "Collateral Agreement" in or about September 2019, both of which pledged as collateral for the joint venture a Florida home that WOLFGRAMM

claimed was then valued at $15,000,000. WOLFGRAMM failed to disclose to J.C. that WOLFGRAMM did not own (and had never owned) the Florida home he pledged as collateral.

**B.     OCF Fraud**

24.     Beginning in or about October 2019, WOLFGRAMM formed and controlled OCF. On two websites maintained by WOLFGRAMM and OCF – www.ohanacapitalfinancial.com and www.ohanabanking.com – OCF marketed itself with the motto "Banking the Unbankable" and purported to offer full financial services to entities that were not eligible for traditional bank accounts.

25.     In personal interactions, WOLFGRAMM also frequently referred to OCF as a bank or as providing banking-type services.

26.     In an effort to further legitimize OCF, the websites listed six individuals as being OCF's "Board of Advisors." At least five of these named individuals, however, were unaware of having any official connection to OCF.

27.     The websites also claimed that OCF customer funds were bonded, and that OCF maintained appropriate business insurance.

28.     OCF accepted deposits from customers seeking to use its services, including wire transfers. Once customers deposited funds with OCF, OCF's online portal displayed the amount on deposit – and in at least one case, listing the customer's account as a "checking" account.

29.     OCF received money on deposit from customers who, based on OCF's website and/or WOLFGRAMM's personal representations, understood their money would

be kept on deposit until such time as the customer authorized OCF to release the money (according to the customer's directives). But upon OCF's receipt of deposits from several customers, WOLFGRAMM and OCF, without the customers' authorization, directed that these funds be used for unrelated business expenses.

**M.K.**

30. In or about September 2020, M.K.'s company sought to purchase Personal Protective Equipment (PPE) from a manufacturer in China. M.K. had researched the company and confirmed it was actively registered with the U.S. Food and Drug Administration. To facilitate the transaction, M.K. determined to open an account with OCF and deposit the necessary funds, after which OCF would send the funds to the Chinese manufacturer. Prior to opening that account with OCF, M.K. reviewed OCF's website, www.ohanabanking.com. After reviewing the website, on or about September 19, 2020, M.K. wired $4,950,000 to an OCF account at Mountain America Credit Union (MACU).

31. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and OCF made the following false and fraudulent statements of material facts to M.K.:

    a. That OCF functioned as a bank and financial institution, holding customer funds on deposit until such time as the customer directed OCF to transfer or release the funds; when in fact, customer funds were not held on deposit, but were spent, without customer direction, on unrelated business expenses; and

    b. That OCF customer funds were bonded; when in fact, customer funds were not bonded.

32. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and OCF concealed, among others, the material fact that WOLFGRAMM and OCF spent M.K.'s funds on unrelated business expenses, including a refund to a prior depositor with OCF.

33. After spending M.K.'s funds without authorization, WOLFGRAMM and OCF took several steps to conceal this fact and otherwise lull M.K. into a false sense of security, including the following:

    a. OCF's online portal falsely identified M.K.'s account as a "checking" account; and

    b. After M.K. instructed OCF to wire $2,200,000 to the Chinese manufacturer on or about October 27, 2020, M.K. asked WOLFGRAMM to provide a FED reference number for the expected wire transfer. WOLFGRAMM texted M.K. that same day, "I will send it to you tomorrow morning." WOLFGRAMM and OCF, however, did not and could not provide M.K. with a FED reference number as OCF did not wire any funds to the Chinese manufacturer until on or about October 30, 2020, at which time WOLFGRAMM and OCF only sent $1,200,000. WOLFGRAMM and OCF would not wire the remaining $1,000,000 until on or about November 6, 2020; and

    c. After this series of suspicious delays, on or about November 3, 2020, M.K. instructed WOLFGRAMM and OCF to return the $2,750,100 remaining from his deposit. Thereafter, on or about November 5, 2020, WOLFGRAMM and OCF sent M.K. a "Loss Prevention" email falsely claiming that, due to "suspicious activity," OCF had closed M.K.'s account and would require another "ten to twenty business days" before issuing M.K. a cashier's check for the balance of his deposit.

//

//

//

**V.F.M.**

34. In or about October 2020, V.F.M. sought funding to produce a movie. One company, F.N., promised to fund V.F.M.'s film – if V.F.M. would provide approximately $1,000,000 up front to be held in "escrow" by OCF.

35. Prior to agreeing to these terms, V.F.M.'s representative carefully reviewed OCF's website.

36. On or about November 2, 2020, both F.N. and WOLFGRAMM (on behalf of OCF) signed a letter promising that funds received from F.N. (via V.F.M.) would "remain blocked in [OCF's] account, for the establishment of a credit facility and for the duration of one year from receipt of deposit." The letter further promised that the funds should be returned "with prior 60 days written notice." Based on this representation, and the representations on OCF's website, V.F.M. wired $1,001,000 to OCF on or about November 5, 2020.

37. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and OCF made the following false and fraudulent statements of material fact to V.F.M.:

    a.    That OCF functioned as a bank and financial institution, holding customer funds on deposit until such time as the customer directed OCF to transfer or release the funds; when in fact, customer funds were not held on deposit, but were spent, without customer direction, on unrelated business expenses; and

    b.    That OCF customer funds were bonded; when in fact, customer funds were not bonded; and

  c. That OCF would hold or "block" V.F.M.'s funds in OCF's account for one year from the date of deposit; when in fact, the funds were spent on unrelated business expenses; and

  d. That OCF would return V.F.M.'s funds with 60 days' written notice; when in fact, V.F.M.'s funds were never returned even after written notice was sent.

38. In connection with this transaction and to execute the aforementioned scheme, WOLFGRAMM and OCF concealed, among others, the material fact that WOLFGRAMM and OCF spent V.F.M.'s funds on unrelated business expenses, specifically in funding the $1,000,000 wire to the Chinese manufacturer, on behalf of M.K., as described in paragraph 33(b) above, one day after receiving the funds from V.F.M.

### C. Sports City Fraud

39. In Spring 2021, WOLFGRAMM approached J.O. and expressed interest in purchasing the Sports City complex and land in Draper, UT. On June 30, 2021, WOLFGRAMM and J.O. agreed to a sale of the building and land for $15 million. The contract required WOLFGRAMM to pay $10,200,000 by October 2021, at which point ownership would convey to WOLFGRAMM. Up until that point, the contract required WOLFGRAMM to make rental payments of $85,000 per month to J.O. for use of the building.

40. WOLFGRAMM gained access to the Sports City complex and land in or about July 2021. He also took over billing for all Sports City customers.

41. WOLFGRAMM never made any of the promised rental payments.

42. From July to October 2021, WOLFGRAMM fraudulently collected approximately $158,864 in revenue from Sports City customers. Meanwhile, WOLFGRAMM never paid any utilities or expenses for the Sports City complex.

43. In October 2021, after WOLFGRAMM had failed to make any payments under the sales contract, J.O. terminated the contract and blocked WOLFGRAMM from further access to the Sports City Complex.

44. In connection with this transaction and to execute the aforementioned scheme, on July 8, 2021, WOLFGRAMM provided J.O. with a check for $1,000,000 from an account WOLFGRAMM knew had insufficient funds to satisfy payment of the check and on which account WOLFGRAMM had no signatory authority for.

45. In connection with this transaction and to execute the aforementioned scheme, on September 22, 2021, WOLFGRAMM represented to J.O. that he had made a payment of approximately $255,007 in past due property taxes on the Sports City complex from an account WOLFGRAMM knew had insufficient funds to satisfy the payment.

### Counts 1-5
### 18 U.S.C. § 1343
### (Wire Fraud)

46. All the factual allegations set forth in this Indictment are incorporated by reference and realleged as though fully set forth herein.

47. For the purpose of executing the schemes and artifices to defraud described herein, and attempting to do so, on or about the dates listed in the chart below, WOLFGRAMM, BITEX, and OCF transmitted and caused to be transmitted by means of wire communications in interstate commerce writings, signs, signals, and sounds, including

but not limited to the following instances set forth in the chart below, and with each instance set forth being a separate Count:

| Count | Date | Defendants | Description of Use of Interstate Wire Communication | Related Scheme |
|---|---|---|---|---|
| 1 | 12/24/2018 | WOLFGRAMM, BITEX | Wire Transfer of $543,973 from B.C. at Swissquote Bank (Zurich, Switzerland) to Citibank (New York) to BITEX account ending in x9786 at US Bank (Utah). | BITEX Mining Fraud |
| 2 | 12/21/2018 | WOLFGRAMM, BITEX | Wire Transfer of $229,135.66 from J.C. at Bellco Credit Union (Colorado) to BITEX account ending in x9794 at US Bank (Utah). | BITEX Mining Fraud |
| 3 | 9/17/2020 | WOLFGRAMM, OCF | Wire Transfer of $4,950,000 from M.K. and I.K. at Bank of America (Florida) to Ohana Capital Financial Account ending in x6629 at MACU (Utah) | OCF Fraud |
| 4 | 11/5/2020 | WOLFGRAMM, OCF | Wire Transfer of $1,001,000 from V.F.M. at JP Morgan Chase Bank (Georgia) to Ohana Capital Financial Account ending in x6629 at MACU (Utah) | OCF Fraud |
| 5 | 9/22/2021 | WOLFGRAMM | Email dated September 22, 2021, from WOLFGRAMM's Gmail account to J.O., Subject: Property Tax Payment - Treasurer's Office | Salt Lake County | Sports City Fraud |

all in violation of 18 U.S.C. §1343.

# Counts 6-7
## 18 U.S.C. § 1957
### (Money Laundering)

48. All the factual allegations set forth in this Indictment are incorporated by reference and realleged as though fully set forth herein.

49. On or about the dates listed below, in the District of Utah,

**JAMES WOLFGRAMM and OCF,**

defendants herein, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate or foreign commerce, in criminally derived property of a value greater than $10,000.00, and were derived from the specified unlawful activity of Wire Fraud as alleged above, in instances including but not limited to the counts below:

| Count | Date | Monetary Transaction |
|---|---|---|
| 6 | 10/2/2020 | Transfer of $2,088,864.18 from OCF's MACU account ending in x6629 to Bank of America account ending in x2242 |
| 7 | 11/6/2020 | Transfer of $1,000,000 from OCF's MACU account ending in x6629 to Bank of Communications, Co. Ltd. (Beijing, China) account ending in x4870 |

All in violation of 18 U.S.C. § 1957.

## NOTICE OF INTENT TO SEEK FORFEITURE
### 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461
#### (Criminal Forfeiture)

50. Pursuant to 18 U.S.C. § 981(a)(1)(D) and 28 U.S.C. § 2461(c), upon conviction of any offense in violation of 18 U.S.C. § 1343 (wire fraud), as set forth in this Indictment, the defendant shall forfeit to the United States of America all property, real or

personal, that constitutes or is derived from proceeds traceable to the scheme to defraud. The property to be forfeited includes, but is not limited to, the following:

    a. A money judgment equal to the value of the proceeds the defendants obtained from the scheme to defraud.

Pursuant to 18 U.S.C. § 982(a)(1), upon conviction of any offense in violation of 18 U.S.C. § 1957(a), as set forth in this Indictment, the defendant shall forfeit to the United States of America any property, real or personal, involved in such offenses, and any property traceable to such property. The property to be forfeited includes, but is not limited to, the following:

- A money judgment equal to all property involved in the money laundering charge.

## SUBSTITUTE ASSETS

If any of the above-described forfeitable property, as a result of any act or omission of the defendant,

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third person;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(b)(1), to seek forfeiture of any other property of said defendant up to the value of the above-forfeitable property.

A TRUE BILL:

/s/
_____
FOREPERSON OF GRAND JURY

TRINA A. HIGGINS
United States Attorney

_____
AARON B. CLARK
Assistant United States Attorney